Johnny J.E. MEADOWS

v.

R.K. PROCUNIER, Director, Texas
Department of Corrections.

Civ. A. No. CA–4–82–147–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

Jan. 23, 1985.

Johnny J.E. Meadows, Angleton, Tex.,
Alan L. Busch, W. Michael Bonesio (Court-
appointed), Akin, Gump, Strauss, Hauer &
Feld, Dallas, Tex., for plaintiff.

Doug Becker, Mark White, Atty. Gen.,
Austin, Tex., for defendants.

## MEMORANDUM OPINION

MAHON, District Judge.

The United States Court of Appeals for
the Fifth Circuit in its October 17, 1984
unpublished opinion held:

Before GEE, JOHNSON, and DAVIS,
Circuit Judges.

PER CURIAM: *

Petitioner Johnny Meadows is a state
prisoner currently serving a sentence of
imprisonment for life. Petitioner plead-
ed guilty to murder. Having exhausted
his state court remedies, Meadows filed a
petition for federal habeas corpus relief
pursuant to 28 U.S.C. § 2254 alleging,
among other things [1], that his guilty plea
was tainted by a coerced confession. Af-
ter an evidentiary hearing, the district
court denied the petition. We affirm in
part, but remand for further factual find-
ings on the sole issue of whether Mead-
ows' confession was coerced, and wheth-
er that coercion, if it did exist, tainted the
guilty plea.

Meadows contends that his plea of
guilty to murder on October 4, 1972, was
involuntary because his confession to the
murder was coerced,[2] and the coercive
circumstances tainted the plea.
McMann v. Richardson, 397 U.S. [759]
768, 770, 90 S.Ct. 1441 [1448], 25 L.Ed.
763 (1970).

The district court held that Meadows'
constitutional attack on his prior confes-

sion was waived according to *Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602 [1608], 36 L.Ed.2d 235 (1973). Generally, "a guilty plea represents a break in the chain of events which has preceded it in the criminal process," and the defendant "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Id.; See Brady v. United States*, 397 U.S. 742, 750, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970); *McMann v. Richardson*, 397 U.S. at 770, 90 S.Ct. at 1148; and *Parker v. North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970).

*McMann* specifically excepted from this general prohibition those "situation[s] where the circumstances that coerced the confession have abiding impact and also taint the plea." 397 U.S. at 767, 90 S.Ct. at 1441. "It is not disputed that in such cases a guilty plea is properly open to challenge." *Id.* (footnote and citation omitted).

Meadows' claim arguably comes within this exception. If true, his claim would not be barred by *Tollett*, as the district court held. The district court should have scrutinized the circumstances surrounding the prior confession to determine whether any alleged coercion tainted the guilty plea.[3]

We remand for the district court to make an initial determination on the sole issue of whether Meadows' confession was coerced, and whether the circumstances of that alleged coercion had abiding impact and tainted his guilty plea. For the reasons stated by the district court, all other relief is denied.

Affirmed in part; Vacated and Remanded in part.

---

* Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that Rule, the Court has determined that this opinion should not be published.

1. We have examined Meadows' claims of a breached plea bargain and ineffective assistance of counsel, and find them meritless.

2. On the same day that Meadows confessed to this murder, he confessed to two other murders. In other proceedings, both those confessions were found to be involuntary.

3. The petitioner's plea was entered after normal working hours, only a few hours after the allegedly coerced confession. The local prosecutor refused to participate in the guilty plea proceeding because of these unusual circumstances. Moreover, in other proceedings, two confessions made during the same period of interrogation were found to be coerced and consequently excluded. If coercion is demonstrated here, the circumstances may have had abiding impact and tainted the plea.

The Mandate of the Fifth Circuit issued on November 9, 1984, in pertinent part provides:

.... It is now here ordered and adjudged by this Court that the order of the District Court appealed from in this cause be, and the same is hereby, affirmed in part; vacated and that this cause be, and the same is hereby, remanded in part to the said District Court in accordance with the opinion of this Court.

The Fifth Circuit in its said October 17, 1984 opinion found

... Meadows' claims of a breached plea bargain and ineffective assistance of counsel ... meritless.

The remaining issue was the allegation of involuntary plea with four sub-issues. The said October 17th opinion delineates the scope of the remand as:

.... We ... remand for further factual findings on the sole issue of whether Meadows' confession was coerced, and whether that coercion, if it did exist, tainted the guilty plea.

Meadows contends that his plea of guilty to murder on October 4, 1972, was involuntary because his confession to the murder was coerced, and the coercive circumstances tainted the plea....

....

.... The district court should ... (scrutinize) the circumstances surrounding the prior confession to determine

whether any alleged coercion tainted the guilty plea.

We remand ... on the sole issue of whether Meadows' confession was coerced, and whether the circumstances of that alleged coercion had abiding impact and tainted his guilty plea. For the reasons stated by the district court, all other relief is denied.

Accordingly, denial of relief as to three of the sub-issues under the issue of involuntary plea

b. death penalty

c. incompetency

d. inadequate admonishment of the elements of the offense

has been affirmed by the Fifth Circuit's opinion. In summary, the said October 17, 1984 opinion denies relief on eleven of the twelve claims raised.

*The Remaining Claim*

The twelfth claim considered by the court in its July 1, 1983 memorandum opinion was denoted as

a. coercion and duress

under the issue of involuntary plea, which was the short title derived from Petitioner's Third Amended Petition for Writ of Habeas Corpus filed on January 6, 1983, following the evidentiary hearing by his able court appointed counsel.

Petitioner acting by and through his able court appointed attorneys stated this sub-issue as his 33(a):

(a) Petitioner's guilty plea was a direct result of a pattern of continual physical and mental coercion and duress and by threats of physical harm to Petitioner and Petitioner's family....

With due deference to the appellate court, this court in its July 1, 1983 Memorandum Opinion held at page 17

a. coercion and duress

A guilty plea represents a break in the chain of events which has preceded it in the criminal process. *Tollett v. Henderson, supra* [411 U.S.] at 267 [93 S.Ct. at 1608].

b. Death penalty

Petitioner contends that his guilty plea was the result of coercion; however, he does not allege actual or threatened physical harm, promises to cease improper harassment, or bribes. He alleges that his plea was induced by threats to prosecute him for an offense which carried a possible death sentence. Judge Gee speaking for the Court in *Jones v. Estelle*, 584 F.2d 687, 690 (5th Cir.1978) held:

.... A plea is not involuntary solely because a defendant pleads guilty out of a desire to limit the possible penalty. *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); *Brady v. United States, supra; Weaver v. Texas*, 474 F.2d 1135 (5th Cir.); *cert. denied*, 414 U.S. 1064, 94 S.Ct. 569, 38 L.Ed.2d 468 (1973). To establish coercion Jones must show that the fear of the greater penalty destroyed his ability to weigh rationally, with aid of counsel, the advantages of proceeding to trial against those of pleading guilty. *See Brady v. United States*, 397 U.S. at 750–51, 90 S.Ct. 1463. There has been no showing that petitioner's guilty plea was coerced.

The court has reviewed the holdings in *Tollett v. Henderson, supra*, and *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *McMann* at page 767, 90 S.Ct. at page 1447 provides:

.... In these cases, as the Court of Appeals recognized, the confession, even if coerced, is not a sufficient factor in the plea to justify relief. Neither do we have before us the uncounseled defendant, *see Pennsylvania ex rel. Herman v. Claudy*, 350 U.S. 116 [76 S.Ct. 223, 100 L.Ed. 126] (1956), nor the situation where the circumstances that coerced the confession have abiding impact and also taint the plea. Cf. *Chambers v. Florida*, 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716] (1940). It is not disputed that in such cases a guilty plea is properly open to challenge. (footnote omitted).

The sub-issue numbered as 1a was the issue of "Involuntary Plea" with specific

claim of "coercion and duress" described by Petitioner that his guilty plea was a direct result of a pattern of continual physical and mental coercion and duress and by threats of physical harm to himself and his family.

This court in its said memorandum opinion held that *Tollett v. Henderson, supra* 411 U.S. at 267, 93 S.Ct. at 1608:

We thus reaffirm the principle recognized in the *Brady* trilogy: a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann.*

Petitioner contends his guilty plea was a direct result of a continual pattern of physical and mental coercion and duress and threats of physical harm. He neither alleged nor offered proof of actual or threatened physical harm, promises to cease improper harassment, or bribes, but rather alleged his plea was induced by threats to prosecute him for an offense which carried a possible death penalty.

The court believes the October 17, 1984 opinion of the Fifth Circuit holds that the coercion and duress sub-issue is without merit.

Mandate Issue: "[w]hether Meadows' confession was coerced, and whether the circumstances of that alleged coercion had abiding impact and tainted his guilty plea."

The court believes the Fifth Circuit opinion mandates that one unresolved sub-issue under the question of involuntary plea is raised:

a. Whether Meadows' October 4, 1972 confession was coerced; and

b. Whether the circumstances of that alleged coercion had abiding impact and tainted his guilty plea.

a. *Claim Belatedly Raised*

This issue is raised as a new claim by Petitioner in his Third Amended Petition for Writ of Habeas Corpus filed on January 6, 1983, or some two weeks after the December 20–23, 1982 evidentiary hearing.

The evidentiary hearing had been granted on limited issues in a September 21, 1982 Order:

IT IS ORDERED that Petitioner Johnny J.E. Meadows is granted an evidentiary hearing in the court on the two issues:

(1) His guilty plea was a direct result of physical coercion and duress and by threats of physical harm to Petitioner's wife and children.

(2) He was mentally incompetent to enter a plea of guilty due to the result of drugs and his prior treatment.

The court permitted counsel and Petitioner, who took a very active role in the management of his case, to range far afield from the issues specified in the order granting the hearing so that new issues of breached plea bargain and ineffective assistance of counsel were considered.

The Fifth Circuit in its October 17, 1984 opinion perceives the issue of a coerced October 4, 1972 confession apparently from his number 33(e).

b. *Law of the Case*

Interestingly, the prior opinion in *Meadows v. Charles W. Lindsey*, and *W.J. Estelle, Jr.*, Civil Action No. 4–75–116 held

The Record affirmatively shows that Meadows' guilty plea was entered intelligently and voluntarily.

In a February 24, 1978 Order, Chief Judge Charles Clark held in *Meadows v. Estelle*, Fifth Circuit No. 78–813:

IT IS ORDERED that petitioner's pro se application for certificate of probable cause and for leave to appeal in forma pauperis is denied.

This would have been dispositive of the claims raised except Petitioner forum

shopped to the Eastern District of Texas where the case was ready for dismissal as having been previously determined against Petitioner, until Petitioner successfully convinced a second magistrate handling this case in the Eastern District that *Potts v. Zant,* 638 F.2d 727, 750 (5th Cir.1981) mandated an evidentiary hearing in this case. Albeit regrettable, the Eastern District of Texas magistrate misadvised his judge so that an evidentiary hearing was granted and the case transferred to this district.

The court believes that the prior finding on this issue which was appealed and left in tack by the Fifth Circuit should be the law of the case in this matter. The December 1982 hearing was held in deference to the ruling of Chief Judge Justice of the Eastern District of Texas.

c. *Evidentiary Hearing*

■ An evidentiary hearing was held commencing December 20, 1982 involving some thirty hours of hearing, at which time Petitioner and his able counsel were permitted to present all the witnesses

... during the December 20–23, 1982 evidentiary hearing....

they desired to call. Petitioner in his November 29, 1984 Memorandum of Law suggests no additional evidence that could be developed in another evidentiary hearing.

The mandate of the appellate court is a remand for further factual findings on the sole issue of whether Meadows' confession was coerced.

The court finds that Petitioner has had an opportunity to present all evidence and witnesses on the issue in question and a further evidentiary hearing would add nothing to the resolution of the issue in question except further delay.

d. *Claim Exhaustion*

It is doubtful this claim has been exhausted in the state courts; however, Petitioner apparently has worn out his welcome in the state courts. The Fifth Circuit opinion mandates further fact findings on the issue of whether his confession was coerced, accordingly, this claim is being considered on the merits.

e. *Preliminary Questions*

The allegedly coerced confession was made on October 4, at the Tarrant County Jail and states on its face that

.... This statement was started at 2:00 p.m. and finished at 2:50 p.m. on this date.

known to this court to be well within the limits of normal working hours for a state prosecutor and state trial judge.

The court has before it the claim that Meadows' confession to the kidnapping and strangulation murder of Gloria Sue Nix Green on or about June 17, 1971, was coerced. Suggestion has been made that Judge John Vance of the 194th Judicial District Court, Dallas County, Texas, in a state proceeding has ruled favorably for Petitioner. Neither party has developed any such suggestion for this court, except by filing of the transcript.

The claim presented is intertwined with the other claims previously considered so many, if not all, of the significant facts have been developed. The court in its July 1, 1983 memorandum opinion held:

Petitioner asserts that he was incompetent

.... resulting from approximately nine months of isolation, excessive doses of Seconal and other medication, continual interrogation, and the absence of counsel....

Except for Petitioner's self serving statements and testimony, not a scintilla of evidence has been introduced to raise even a substantial doubt as to his competency much less support this claim.

The majority of the witnesses called during the December 20–23, 1982 evidentiary hearing were involved in this case through law enforcement backgrounds or as family of the Petitioner. Petitioner called Wesley H. Green and his wife Fleda who fit neither category and obviously had no axe to grind nor position to justify, with Mr. Green seeing Petitioner every week in the Ector County jail. On cross-examination the questioning began:

BY MR. BECKER:

Q. Mr. Green, I am Doug Becker from the Attorney General's office of Texas.

When you visited Johnny in the Ector County jail, I believe you testified that his physical condition seemed to be normal to you?

A. Yes.

Q. As far as you could tell?

A. Yes.

Q. It comported with your memory of him from having seen him on the prior occasions that you saw him?

A. Yes.

Q. Okay. What did—what was his emotional condition? How did it appear to be?

A. Well, I would say it was fairly stable.

Q. Uh-huh. Did he seem nervous or upset to you?

A. Oh, yes, he was nervous.

Q. Well, he had been charged with murder, hadn't he?

A. Pardon?

Q. He had been charged with murder at that point?

A. Oh, yes.

Q. Did he seem—I think that the phrase that you used is that he seemed reasonably stable to you?

A. Yes.

Q. Did he appear to be on any kind of drugs, as far as you could tell?

A. No, not as far as I could tell.

Q. Did he say anything to you about being on drugs?

A. No.

Q. So, generally, except for being nervous about his condition, his physical and emotional condition seemed all right to you?

A. Yes.

No testimony was offered even suggesting incompetency on the part of Petitioner except his own self serving testimony.

Jerry Loftin, his Fort Worth court appointed attorney, testified that he had no trouble communicating with Meadows with some visits lasting as long as two hours,

that insanity was not a proper defense, and that he saw no difference in Johnny's condition on August 24th and October 4th. Former Ector County Deputy Sheriff Faught testified he had never seen Meadows when Johnny did not know what he was doing. As the court noted in *Bruce v. Estelle*, [483 F.2d 1031 (5th Cir.1973)] *supra*.

.... the standard which should be met to sustain such a claim, *viz.* a history of mental illness, substantial evidence of mental incompetence at or near the time of trial supported by the opinions of qualified physicians and the testimony of laymen. The burden is on the petitioner to prove his allegations; such proof should be clear and convincing.

Except for Petitioner's self-serving testimony, not one single thing in the evidentiary hearing gave any indication whatever that Meadows was mentally incompetent. *United States v. Smith*, 436 F.2d 787, 789 (5th Cir.1971).

d. Inadequate admonishment of the elements of the offense

Petitioner acting by and through his counsel asserts

(c) Petitioner was not properly admonished of the meaning of the elements of the offense.

The transcript of the October 4th plea hearing discloses that the state trial court substantially complied with the required state procedure. Meadows makes no showing that he was misled or harmed by the admonishment of the state trial court.

....

Q. Did I further advise you that the burden was on the State of Texas to prove their case?

A. Yes.

Q. That we could stand mute, we didn't have to offer any evidence?

A. Yes.

Q. And it was further my advice we should go to trial on this matter?

A. Correct.

Q. Knowing all this, of your own free will you advised me you wished to plead guilty on this offense?

A. Yes.

Q. Have I represented you, to your feeling, to the best of my ability—is there anything I have not done that you have requested of me?

A. Nothing.

Q. You understand that by pleading guilty in the introduction of this evidence against you that you will be found guilty by this Court?

A. Yes.

MR. LOFTIN: Pass the witness.
THE COURT: All right. Step down.

e. Failed to pursue motion to suppress oral confession
Petitioner details this sub-issue

(9) Counsel refused and failed to pursue Motion to Suppress oral (New Mexico) confessions when trial court arbitrarily denied same; same confessions being by which the state charged Petitioner as described in above paragraphs....

Petitioner failed to offer any significant evidence in support of this sub-issue.

f. Failed to pursue insanity defense

The only credible evidence offered was that Petitioner was competent and insanity was not a proper defense. This issue is discussed further under sub-issue 1(c) above.

g. No defense
Petitioner failed to offer more than his conclusory allegations.

Attorney Jerry Loftin was appointed as Tarrant County co-counsel nearly four and one-half months before the confession, sentence bargain, plea, and sentence, and as the third court appointed counsel stemming from the murder in question.

Anyone who has read this or other Johnny Meadows' files will readily perceive that Mr. Meadows takes a very active part in his own cases. In fact, he sought permission to file his own pro se post hearing brief in this case despite having two able lawyers who were filing a brief on his behalf. During the evidentiary hearing he specified questions and lines of questioning which his able attorneys pursued, although frequently they had little or no relevance to the issues before the court.

Petitioner's counsel advised him to talk to no law enforcement officers without his attorney being present, to sign no statements or confessions, to persist in his plea of not guilty, and to try the case.

Contrary to his attorney's advice, he talked with Ector County officers behind his attorney's back, struck a sentence bargain, continued his management of the case after his attorney stopped the proceedings and consulted with him, signed a confession, and changed his plea to guilty against his local counsel's advice. Lawyer Meadows presented his attorney with his confession and life sentence bargain as a fait accompli.

Unlike the fact situation in *Washington v. Strickland, supra* [693 F.2d 1243] at 1252 where the attorney's conduct of a state capital-sentencing trial was critical, Attorney Loftin had no sentencing or other strategy to consider since his client with the bit in his teeth already had run out of the lot and slammed the gate behind himself. None of the "five major lines of cases involving the duty to conduct adequate investigation before proceeding to trial", *id.*, is applicable to the facts in this case.

A defendant has a right to representation and can choose whether that representation be by an attorney or pro se. Similarly, a defendant enjoys an absolute right to testify or not testify and is not bound by his attorney's advice.

As the court notes in *White Hawks v. Solem*, 693 F.2d 825, 827, n. 3 (8th Cir. 1982):

... It is, after all, the defendant's prerogative to plead guilty or not, as he chooses. Our inquiry must focus on whether there has been effective assistance of counsel.

.... [E]ach person is ultimately responsible for choosing his own fate, including his position before the law. A defendant has the moral right to stand alone in this hour of trial and to embrace the consequences of that course of action....

*Chapman v. United States*, 553 F.2d 886, 891 (5th Cir.1977).

The Petitioner Meadows exercised his prerogative to talk to the officers behind the back of his attorney, to sign a confession, and to make a sentence bargain. He waived several constitutional rights by his action; however, he has that absolute right to make such choices if he knows what he is doing and his choice is made with his eyes wide open. Meadows knew what he was doing and the consequences thereof. Petitioner at this juncture should not be allowed to profit in this collateral attack from his own folly. See *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 [63 S.Ct. 236, 241, 87 L.Ed. 268] (1942).

The only testimony supporting Meadows' allegations in any significant detail was his own self-serving testimony with a slight buttressing from the testimony of his own twenty-three year old daughter Sandra Meadows Mapp, whose recounting of events a decade or more ago was diminished to many obvious discrepancies.

Frequently, the true facts of a case may be discerned from a limited segment of the total evidence. Testimony disclosed that Delores, the then wife of Petitioner, left Gainesville, Texas, to return to prostitution in Odessa, Texas. Petitioner during the first day of the evidentiary hearing on direct examination testified:

Q. Where did you live in Gainesville?

A. It was an apartment house. I forgot. I forgot the address. It has been years.

Q. Do you remember the approximate date that you moved from Odessa?

A. It was in February.

Q. Of what year?

A. January. It was in January of '71, 1971.

Q. It was about four years after you moved to Odessa?

A. Correct.

Q. How long did you live in Gainesville with your family?

A. Approximately—excuse me—approximately 120 days.

Q. Did your family stay together that whole time in Gainesville?

A. For the first week my wife was there, and then she was removed.

Q. What do you mean when you say "she was removed"?

A. They came from Odessa. Gabriel sent two pimps, Douglas Johnson and Eddie Berry, and one white prostitute, Gail; took Delores back to Odessa.

Q. How did you know they did this?

A. I went to Odessa to find her and talk to Gabriel, and he told me.

Later in the evidentiary hearing, Delores testified on direct examination concerning the same trip, only ascribing a very different causation.

Q. Mrs. Homesley, do you recall living in Gainesville, Texas, with Johnny Meadows in January 1971?

A. I know we moved back to Gainesville, I am not sure what time it was.

Q. All right. Did you have occasion to leave that place in Gainesville?

A. Yes, sir.

Q. Okay. Where did you go when you left?

A. Back to Odessa.

Q. And how did you get to Odessa?

A. On the bus.

Q. Who put you on the bus?

A. Johnny did.

THE COURT: I didn't understand the answer.

THE WITNESS: Johnny did.

THE COURT: Johnny Meadows?

THE WITNESS: Yes, sir.

BY MR. BECKER:

Q. Why did he put you on the bus?

A. To go back to Odessa to work.

Q. As a prostitute?

A. Yes, sir.

The testimony of Meadows quoted above begins at line 22 of page 73 through line 19 of page 74 of the transcript. The quote of Delores' testimony is from page 579 of the transcript.

The court has reviewed the four volume, one thousand one hundred thirty-seven (1,137) page transcript of the thirty hours of hearing in this case, and the two volume, four hundred twelve (412) page transcript of the hearing before Judge Vance.

*Footnotes*

The second and third footnotes to the said October 17, 1984 opinion seem to pose questions for resolution by this court.

Footnote 2

The Footnote numbered 2 states

2. on the same day that Meadows confessed to this murder, he confessed to two other murders. In other proceedings, both those confessions were found to be involuntary.

With due deference to the appellate court, Judge Vance rules the State failed to meet its burden of showing the Cugot and Maynard confessions were voluntary. The court beginning at line 3 of page 146 through line 14 of page 147 or Volume Two held:

THE COURT: Well, in a hearing such as this on voluntariness, it is the State's responsibility to present evidence, if they have evidence, to show that the statement was voluntarily taken, and I think the State has fallen short, even though I know they have produced everything they have. I'm sure that they have.

The Court finds that State's Exhibit No. 1, No. 2, No. 5 and No. 6 were not voluntarily made and are not admissible.

Now, one thing further. Is this case going to be tried Monday?

MR. PICKETT: I wouldn't think so, Your Honor.

MR. GREEN: Judge, the State does not have a case.

THE COURT: All right. I want the record to reflect that I am going to have a copy of this hearing, both volumes, furnished to the Public Library in Odessa, in case the citizens there are interested.

Secondly, I am going to have a copy referred to the Attorney General of The State of Texas and to the FBI,. and request a full investigation by each agency as to this matter of Defense Exhibit No. 4. These marks have nothing to do with the voluntariness of the confessions, but I think there should be an investigation made to see if the prisoner's civil rights have been violated.

That's all.

The Dallas state trial judge ruled the state failed to discharge its burden of showing the statements were voluntary. No finding was made that the confessions taken just before and after the confession in question here were involuntary.

A review of the "sub rose hearing" transcript discloses a hearing with neither the prosecutor nor defense attorney adequately prepared to present the applicable facts to the court. This resulted in numerous misstatements of fact so the court ruled against the state upon whom the burden of showing the voluntariness of the confessions fell. A sub rose hearing is a secret or secretive hearing. The transcript of the hearing is filed in this case and does not appear secretive. (T. 568).

The state trial judge states the alleged branding of Petitioner played no part in his decision:

.... I am going to have a copy of this hearing, both volumes, furnished to the Public Library in Odessa, in case the citizens there are interested.

Secondly, I am going to have a copy referred to the Attorney General of The State of Texas and to the FBI, and request a full investigation by each agency

as to this matter of Defense Exhibit No. 4. These marks have nothing to do with the voluntariness of the confessions, but I think there should be an investigation made to see if the prisoner's civil rights have been violated.

That's all.

A review of the ruling and actions of the state trial judge and the appellate court opinion suggest the allegations of branding of Petitioner played some part in their respective decisions.

Petitioner on direct examination adroitly interjects in his evidentiary hearing the state court hearing on the Linda Lee Cugot and Ruth Maynard statements and the state trial court's ruling the state failed to discharge its burden of proving their voluntariness. (T. 172).

In the state court hearing, Meadows testified under oath beginning at page 73 of Volume Two with his counsel summarizing in a question at page 80:

Q. (By Mr. Pickett) Your testimony is that Tom Barker, in the middle of the night on approximately December 15, 1972, in an isolation cell in Ector County, Texas, branded these marks on your back?

A. That's correct, it was in the morning, it was in the morning, it was after midnight.

Former Ector County District Attorney John Green disclosed in his testimony apparently the true facts in the branding. (T. 488–490).

Q. All right. Why were the confessions suppressed in that case? What did the judge hold?

A. The confessions—I was present at the hearing, and the confessions were suppressed based on the evidence.

Mr. Meadows had told the Court that was hearing the confession suppression hearing that he was branded in the Ector County jail and made to confess to those crimes.

He jumped up in court unbeknowns to us—at the hearing, he jumped up in court and took his shirt off, and he had

the State of Texas branded on his back with four women who he is alleged to have murdered on his back.

The judge was totally shocked, which I don't blame him.

Based upon his testimony that we had branded him—not we, but the investigator and sheriff had branded him in Ector County, Texas, some prior months to him being transferred to Dallas where we were fixing to try the case—when that happened, I at that time contacted the FBI and the Texas Rangers to investigate this.

Q. Just a minute, Mr. Green.

Is it your recollection of that hearing that Mr. Meadows testified he had been branded before the confessions?

A. Yes. He had been branded in Ector County before he was brought to Odessa—I mean, brought to Dallas.

Q. Of course, now, there had already been the guilty plea, and it is your recollection that he wasn't testifying he had been branded and further punished after the guilty plea, but that he had been branded in order to coerce the confessions?

A. Yes.

Q. Okay. You caused the investigation to take place.

What was the outcome of the investigation?

A. The outcome was the Texas Rangers and I—again, a doctor was involved in it. I am trying to relate back. I do not know the doctor's name.

A conclusion was reached—and it is brought out in district court in Ector County—that an inmate had taken a wire off of a mop and made a State of Texas and taken some tissue, toilet tissue, and started a fire in the commode there and superfically burnt Mr. Meadows' back. And we had an exert—the FBI or the Rangers one, Your Honor, I can't remember which—got an exert (sic) that the prisoners had been getting Blistex. And they say, if you heat this Blistex, an acid comes out, and they would take the

acid and make it look like a superficial burn.

And then it is my understanding—I believe I am right, Your Honor, without referring to that file—an inmate testified that is what happened in Dallas County.

Also there was pictures taken when Meadows left, when the defendant left Ector County, showing his back, and those showed when he left there was no such thing. Luckily there was a photographer there, as I recall, a newsman. And when he was leaving there was no State of Texas brand on his back, which their investigation revealed this was done by him in the Dallas County.

The court has reviewed the investigative report of the Federal Bureau of Investigation on the branding. The Civil Rights Section of the Department of Justice authorized closing of the alleged civil rights action against Thomas Eugene Barker. The report confirms the branding occurred in the Dallas County Jail by a fellow prisoner at Meadows' instigation.[1]

1. 194th District Court Judge John Vance in a May 1, 1973 letter to Special Agent in Charge J. Gordon Shanklin, Federal Bureau of Investigation, Dallas, Texas, requested an investigation to determine if the rights of Johnny E. Meadows had "been violated in regard to this matter of 'branding'".

On April 30, 1973, Meadows gave a nine-page signed statement to two Special Agents of the Federal Bureau of Investigation alleging in pertinent part:

"A few nights before Christmas, 1972, I was in my cell asleep. I was laying on my stomach with my head on a pillow made of a blanket. I had just been moved that day to an isolation cell located on the east side of the jail. There was no one in the cell with me. I was awakened by someone putting their hands or knee on my neck forcing my head into the blanket. Someone else grabbed my legs and another grabbed and held my shoulders. I struggled to get away from them but I could not move or see what was going on. I was sleeping only in my shorts. Tom Barker was in the cell and he was talking to me. I could recognize his voice. I estimate there were three or four men in the cell besides Barker. Barker said, "Now John, you wanted to see the FBI and the Texas Rangers, and you will see them. You tell them or anyone else anything you want to tell them but just remember this is what 5 gallons of gas will feel like to one of your kids." These were not his exact words but they are as best as I can remember them. Then I felt this burning sensation on my back. I screamed and yelled but my face was buried in the blanket and my voice was muffled. I didn't know what they were doing to me at the time. When they were through, Barker said, "Now John, don't you move" and then they left. I did not move or look at them. I do not know who was in the room with Barker. I layed there a while then I got up and splashed water on my back. I looked in a mirror in the cell to see what they had done to me. I saw they had burned on my back form outlines of the state of Texas each had an initial in the middle of the outline. The initials were "G" "M" "C" and "S" which were the initials of the four women whom I was supposed to have killed.

Dr. Charles R. Baxter, Chief of the Burn Section of Parkland Hospital and Professor of Surgery, Southwestern Medical School, University of Texas, Dallas, Texas, examined Meadows on May 2, 1973, and found the wounds were less than two months old. Dr. Baxter's report of his examination is:

DESCRIPTION OF WOUND:

Four separate wounds, located on the upper half of the back of the patient, are shaped roughly as a Texas map outline, each containing a letter. The upper left map outline contains the letter 'G'; the right upper map outline contains the letter 'C'; the right lower map outline contains the letter 'S'; and the left lower map outline contains the letter 'M'. Each of the four wounds is roughly an outline resembling a map of Texas. The four were not produced by the same object since there is a difference in size, in both length and width of the wounds. The letters within each map are also of different sizes.

The wounds vary between 1 and 2½ millimeters in width, with all wounds having discreet margins. Some areas are extremely straight, as if made by a ruler. Between the superior and inferior margins, the wounds are depressed. Outside of the discreet edges there is no evidence of tissue reactivity, and no residual scarring. At the "tip of Texas" in each wound, and in subsequent areas where a sharp angle is made, the medial borders run together.

The discrepancy in map outlines, (i.e., the dissimilarity of size and contour between all four of the wounds) is apparent. This dissimilarity in size and contour would not likely be produced by a single burning apparatus of the same size being used on all four wounds.

OPINION:

In my opinion, these wounds were originally a superficial to moderately deep second degree burn injury to the skin. The wounds are made on the upper back—not the lower back which would produce more pain. The

A Dallas County state trial judge found the state in a poorly presented hearing failed to discharge its burden of showing two other murder confessions the same day were voluntary. No finding was made that either confession was involuntary.

Meadows' allegation of branding by state officers is without any basis; in fact, the branding was at his own instigation by a fellow inmate in the Dallas County Jail, and apparently has accomplished some of his goals.

Footnote 3

The footnote numbered 3 states:

3. The petitioner's plea was entered after *normal working hours,* only a few hours after the allegedly coerced confession. The local prosecutor refused to participate in the guilty plea proceeding because of these unusual circumstances. Moreover, in other proceedings, two confessions made during the same period of interrogation *were found to be coerced* and consequently excluded. If coercion is demonstrated here, the circumstances may have had abiding impact and tainted the plea.

This footnote contains at least four separate statements. The first two are

The petitioner's plea was entered after normal working hours, only a few hours after the allegedly coerced confession. . . .

As noted earlier the Gloria Sue Nix Green statement states it was taken between 2:00 p.m. and 2:50 p.m. on October 4, 1972. The guilty plea apparently was anticipated during regular working hours since Judge Lindsey asked Assistant District Attorney Rufus Adcock to familiarize the visiting prosecutor with the Judge's procedures (T. 920). Apparently the plea was taken about 5:00 p.m. or shortly thereafter which may be unusual but creates no suggestion of impropriety. (T. 251, 855, 925).

The plea was entered within two to three hours after the statement. To determine if this fact in any manner suggests a coerced confession, the events preceding the October 4, 1972 plea must be examined. The case was transferred on a change of venue to Tarrant County on April 20, 1972, (T. 438) and was set for trial for October 2, 1972, or two days before the plea. Defend-

---

straight lines, the depression of the wounds themselves, the lack of induration or scarring outside of the wound, (that is outside the margin of each wound), and the lack of contracture of the wound mitigates against high intensity heat as the causative agent. One *would expect such wounds to be elevated, to* show involvement outside the edges and contracture which they do not do. The uniform redness of the wounds themselves indicate that they have been present for less than 1–2 months.

I would surmise from the gross appearance of these wounds that they were produced by a caustic agent or low intensity heat (such as a heated wire), applied to lines, scratched, cut or burned; and a caustic substance applied to the injured area. The reactivity of the wounds are such that they have been present for less than 1–2 months. It is likely that a caustic agent such as lye, phenol or other alkaline chemicals were placed into wounds produced by pin or knife scratching or low grade heating or the chemical effect could have been produced by the chemical used to draw the pattern of each wound. The uniformity of the wounds, their depression and lack of reactivity at the margins, mitigate against heat in any form, either matches,

branding iron, etc., as being the causative agent.

In summary, the location of the wounds (high on the back) were selected because of the little pain as compared to other areas; the wounds are not deep enough to be torture wounds; they are less than 2 months old; and were produced either by cutting plus chemicals or heating plus chemicals; the lack of uniformity between the outline rules out a single "branding iron" as a causative agent. These wounds would have required between 30 minutes and 3 hours or more to inflict and require subject cooperation to have been accomplished.

The Federal Bureau of Investigation determined that on March 13, 14 or 15, 1973, Meadows' fellow Dallas County cellmates William Edward Simonton and Russell Glen Tores placed brands on Meadows' back at Meadows' request. Meadows stated he wanted the brands put on his back for jury phychology, and he could use it for appeal as violation of the Eighth Amendment as cruel and unusual punishment.

On May 11, 1973, an assistant United States Attorney declined criminal prosecution of Meadows for false statement to the Federal Bureau of Investigation because of his more serious state charges.

ant's First Motion for Continuance was granted on September 22, 1972, and the case was re-set for November 13, 1972. Without the confession, the prosecutor testified the state had a good circumstantial evidence case and he expected to obtain a conviction. (T. 476–479).

Petitioner struck his own plea bargain, signed a confession, and entered a plea two days after he was originally scheduled to go to trial, which does not suggest a coerced confession.

The third statement found in the footnote is

> The local prosecutor refused to participate in the guilty plea proceeding because of these unusual circumstances. . . .

Again with due deference to the appellate court, the veteran prosecutor (T. 917) testified the district attorney from the original jurisdiction normally tries the case. Judge Adcock testified defense attorney Jerry Loftin was upset because "he said he lost control of his client;" and Adcock "simply felt that—kind of a sixth sense that I didn't want to partake in the particular situation". (T. 921). The court understood this able and experienced prosecutor to be saying there was no necessity for him to participate, the defendant was refusing to follow his attorney's advice, and his sixth sense told him this defendant was trouble. If the prosecutor had felt the circumstances were improper or suggested other than a voluntary plea, he would have been under an ethical duty to make his concerns known to Judge Lindsey who he worked with on a daily basis.

The final statement in the footnote is

> . . . . Moreover, in other proceedings, two confessions made during the same period of interrogation were found to be coerced and consequently excluded. . . .

As discussed in depth above, the Dallas state trial judge held the state failed to meet its burden of showing the Cugot and Maynard confessions were voluntary. No finding of a coerced confession has been shown.

The court having heard the evidence believes the Dallas state court judge held the state had failed to meet its burden of showing the voluntariness of these statements for probably three reasons: first, neither side appeared prepared for the hearings and many misstatements of fact are made by both counsel resulting in the state failing to discharge its burden; second, the branding of Petitioner was interjected which influenced the judge (T. 494); and, third, the judge may have been influenced by prior knowledge of one of the officers obtaining the statement. (T. 517).

Mandate Issue:

> (a) Whether Meadows' October 4, 1972 confession was coerced?
>
> (b) Whether the circumstances of that alleged coercion had abiding impact and tainted his guilty plea?

The historical facts in this case were detailed at pages 19–20 of the November 9, 1977 findings, conclusions and recommendation of the magistrate in *Johnny J.E. Meadows v. Charles W. Lindsey, Judge of Criminal Court Number 3, 70th Judicial District, Tarrant County, Texas, and W.J. Estelle, Jr., Director, Texas Department of Corrections,* Civil Action No. CA-4-75-116.

A short summary of the events preceding Meadow's plea on October 4, 1972, gleened from Meadows' pleadings may be beneficial. Meadows states his troubles began on or about June 19, 1971, when he becomes a suspect in the June 17, 1971 murder of Gloria Sue Nix Green; he was arrested on June 22, 1971, at Gainesville, Texas, and transported to the Ector County, Texas jail; and while so confined he was contacted by attorney Tom Sneed. Next, Petitioner was taken to Lubbock, Texas, questioned for two days and returned to Ector County jail. Meadows was released on bond. Petitioner then traveled throughout Texas for a period and on September 26, 1971, jumped bond and traveled with his family through thirty-eight (38) states.

In last November, 1971, Meadows and his family arrived at Aztec, New Mexico,

where they lived under assumed names until his arrest in mid-January, 1972. Following his arrest, Petitioner was confined in the San Juan County jail at Aztec, New Mexico. A day or so later he was arraigned and Attorney Tom Haynes was appointed to represent him. A few days later, Meadows waived extradition to Ector County, Texas.

Meadows was confined in the Ector County jail from apparently late January, 1972, until April, 1972. He was represented by Attorney Tom Sneed during this period.

On April 20, 1972, the Judge of the 70th District Court of Ector County, Texas, on Petitioner's April 19, 1972 Motion, transferred a murder indictment against the Petitioner to Tarrant County, Texas.

Meadows was transferred apparently in late April, 1972, to the Tarrant County jail at Fort Worth, Texas. Tom Sneed, Petitioner's Odessa attorney, in a May 15, 1972 letter to the Judge of Criminal District Court No. 3 relayed Meadows' request to have a Fort Worth attorney with whom he could talk appointed to assist his Odessa attorney "in the trial of this case and also to counsel with Mr. Meadows". Fort Worth Attorney Jerry J. Loftin on May 25, 1972, was appointed to assist in the case.

On August 10, 1972, the State filed notice that it would not seek the death penalty in this cause. On August 10, 1972, Attorney Loftin filed a Motion to Prevent Interrogation of Meadows.

On August 24, 1972, Attorney Loftin filed Defendant's Motion for Discovery consisting of twenty-six (26) numbered paragraphs and a hearing was held that day in which the discovery sought in some thirteen (13) paragraphs including three oral requests was granted.

Trial was set for October 2, 1972 at 9:00 a.m. with the State issuing subpoenas for some thirty-five (35) witnesses, including the Sheriff and a Deputy Sheriff from Gainesville, Texas; the Sheriff, A Deputy Sheriff and Police Magistrate from Aztec, New Mexico; Texas Ranger James Riddle; and one or more psychiatrists.

Court appointed Attorney Jerry Loftin filed another Motion for Discovery on September 22, 1972, which was denied. Meadows' First Motion for Continuance was filed and granted on September 22, 1972, with the case being reset for November 13, 1972.

On October 4, 1972, a Waiver of Jury Trial and a separate Agreement to Stipulate Testimony were signed by Meadows and approved by the Court. A twenty-six (26) page transcript of the proceedings in open court on October 4, 1972, is attached hereto and incorporated herein as Appendix A.

On October 6, 1972, Odessa Attorney Tom Sneed filed a Motion to Withdraw as Attorney of Record for Meadows which was granted. Attorney Sneed states as his "... reason that Defendant totally and completely refuses to cooperate with said attorney".

At the time of the plea and sentencing on October 4, 1972, Meadows gave notice of appeal. Judge Charles W. Lindsey in his January 27, 1975 Memorandum and Order in Nos. C–207 and C–213, styled *Ex Parte Johnny E. Meadows* reveals the purpose of the notice of appeal

Following the trial Petitioner, in writing, waived the passage of ten days and the Court promptly sentenced him. Petitioner then caused his attorney to give notice of appeal. The Court inquired if this was a serious appeal. Whereupon a conference between the Court, the Petitioner and his counsel, was held at the bench out of the hearing of the reporter and the Court was informed that Petitioner had two more murder charges pending in Ector County and the appeal was to prevent the instant conviction from becoming final before the other two cases were disposed. Thereupon the Court appointed counsel to represent Petitioner on appeal.

A copy of Judge Lindsey's said Memorandum and Order is attached hereto and incorporated herein as Appendix B.

On October 11, 1972, a Motion for New Trial was filed by Attorney Loftin on behalf of the Petitioner.

The court appointed attorneys representing Petitioner were (1) the late Tom Sneed, a then thirty-nine year old attorney practicing law for thirteen years, who was described as one of the top criminal lawyers in Odessa (T. 556), and (2) Jerry Loftin who is known to the court to be one of the ablest criminal defense attorneys and whose credentials are set forth at pages 824 and 867 of the transcript.

Petitioner was transferred to the Tarrant County Jail on April 15 or 16, 1972 (T. 181). No serious suggestion is made that Petitioner was subjected to any unusual handling from this point through his plea on October 4, 1972 (T. 183), nor to forced visitation (T. 30).

He was represented by able counsel who was preparing to go to trial. Attorney Loftin had secured an order from the state trial judge that the Ector County law enforcement officers were to contact Mr. Loftin before visiting with Petitioner with the qualification "... if Mr. Meadows on his own wished to waive that right, that he could do it....". (T. 836).

Although Petitioner had been aware from his early incarceration that he did not "have to talk to anybody that ... (he) didn't want to, whether it was a police officer or not...." (T. 346), on October 3, 1972, in the evening he called the Ector County Sheriff requesting Sheriff Gabrel come to Fort Worth (T. 1072). Former Sheriff Gabrel and former Deputy Faught drove from Odessa to Fort Worth arriving in the morning. Former District Attorney Green and former Investigator Barker apparently arrived by air (T. 919). Meadows was taken to the jail warden's office in mid morning (T. 222). He was taken before a magistrate or justice of the peace (T. 226, 1073), and advised of his rights. Former Deputy Faught and the Petitioner were in a room typing the statement (T. 1047). Prior to the time any of the statements were signed, Attorney Loftin arrived at the Tarrant County Jail.

Perhaps the clearest picture of the confession and the circumstances can be gleened from Mr. Loftin's testimony. Although intimately involved in the events of October 4, 1972, he has no vested interest in the resolution of the question before the court, except as an officer of the court in seeing substantial justice is achieved. The following excerpts from his testimony in the sequence given is illuminating:

Q. Okay. What happened on October 4th that you recall?

A. My time frame may be wrong. Either I appeared at the Tarrant County jail as to—at the time I appeared, the district attorney from Ector County was present. I think the sheriff of Ector County was there.

Q. This was about noon?

A. I believe it was that time. It could have been later. I am not sure of the time frame.

I was aware and became aware of the fact they had conversations with the defendant. So I was upset about that because I felt like that was not proper.

I reported that to the judge, Lindsey.

Q. How did you become aware of that? I mean—

A. I don't recall. I mean, it was after the fact. I know that because they had already had conversations with Mr. Meadows, and that concerned me.

Q. You described it to me a moment before we came into the courtroom they had already struck a deal?

A. That's true. When I had conversations with Mr. Meadows in the district attorney's office, the district attorney's office and the sheriff had made a deal with Mr. Meadows. I mean, they had conversations. They all were on the same wave channel, and I was not a part of it and had not been contacted in advance.

Q. Who was present at that—

MR. BUSCH: I hate to interrupt at this point. We have got a witness that

walked into the room. I think the rule needs to be invoked.

MR. BECKER: That's Slim Gabrel, Your Honor.

THE COURT: All right. Just wait outside.

THE WITNESS: At that point in time, I was advised—again I don't want to get into the attorney/client relationship—that an agreement had been made, and I had not had the benefit of entering into that agreement.

Rufus Adcock, who was the district attorney's representative, was not a part of that. Rufus, who I have worked with very closely, did not have prior knowledge of it, either. And that concerned me. It concerned me that there was a meeting with—be it court appointed, paid, retained or what have you, that you are having another meeting with the district attorney after you had a judge rule on something and a deal has been made and I am not a part of it. I am out of the thing. That bothered me.

That is why I advised him in open court at the time of his plea not to enter a guilty plea. I advised him not to sign a statement. I told him a statement would be used against him. I would not be a part of witnessing the statement. I left. They said they had a statement prepared and would I witness it?

I said I certainly would not. I would not become an issue as to the—I just wouldn't do it. And I advised him. I had a conversation with Mr. Meadows.

Q. Did you advise the judge of what had gone on?

A. Yes, sir, I did. I mean, as to the statement, no, but, I mean, as to the fact there were people here, yeah.

Q. You didn't advise the judge as to what had gone on without your knowledge prior to your coming down to the courthouse?

A. Did I advise—

Q. Or the jail. Excuse me?

A. When I became aware of the fact that the Ector County officials were there, I contacted Judge Lindsey. I was advised by all of the parties that they had a plea. Not by Judge—Judge Lindsey was not a part of that. I don't mean to imply that. But that they had resolved this matter.

Q. But you didn't mention it to the judge how it was resolved?

A. I had no way of knowing. Again, we had a meeting that I was not a party to, was not called in in advance, and that went on.

And at that point in time an agreement was made between the the parties, and that concerned me because I was not a part of it.

Q. But you didn't advise the judge of all of that?

A. Well, in court I had certainly advised the judge in our admonishment—

Q. Okay. But other than that?

A. —that I did not think the State—other than that, and I checked with the Court. At that point in time, they had an agreement that if the State—the State and defendant, that they were going to enter a plea.

Q. All right.

A. And I contacted Sneed.

Q. I am sorry. Go ahead.

A. I contacted Sneed and called him.

Q. What did Mr. Sneed have to say?

A. Well, he wanted to withdraw from the lawsuit before the entry of plea.

Q. Would the judge allow him to do that?

A. I don't think he did.

Q. Did Mr. Sneed express any reservation about all of this at the time—

A. No, he just—

Q. —about why he wanted to withdraw?

A. Sneed advised me, since he lived in Ector County, he didn't think it would—he wanted to withdraw from the lawsuit before any plea, if I would do it alone, and I told him I would do that. I told him I would take it. I advised the Court that. It is not in a motion here, but that is what Sneed wanted to do.

Q. Who were the Ector County officials you say first—

A. The district attorney was there, Mr. Gabrel was there. There was another individual there, too. I think it was their investigator.

Q. Barker?

A. I believe that is correct.

Q. Okay. How about Mr. Faught?

A. I don't know. I just know there were a number of people.

Q. All right. Did Mr. Rufus Adcock express any concerns to you?

A. I don't know that we had conversation that expressed concerns. I know that he—

Q. Was he requested to remain in the courtroom during the guilty plea?

A. I think he did not. I think he excused himself from the courtroom. I am not positive of that.

. . . .

A. In my admonishment of Mr. Meadows and my conversations concerning the plea, Mr. Meadows was completely aware of the consequences of his plea.

. . . .

Q. Do you know whether Johnny Meadows instigated the confessions with the law enforcement officers?

A. I do not.

Q. Well, if he did, then why would you have cause to be angry?

A. When you use the term angry, that is not correct.

Q. Why would you have any occasion to think that any misconduct had occurred, if the judge's order said the police could talk to them, if he instigated the conversation, and if he, in fact, instigated the conversation, a matter of which you have no knowledge? Then why would you have any occasion to think any violation of the Judge's order had occurred?

A. Well, my concern was that if someone is incarcerated, it appears to me it is not easy for them to contact a district attorney and go to them. If these people are coming in from out of town interrogating individuals, it appears to me to be unusual, in that they come to the individual.

Now, from the standpoint would I file that motion again? Yes.

Q. Is it possible they could have come to the individual because the individual asked for them, for example, to—

A. Of course. Anything is possible.

Q. Yes, sir.

If that happened, then there would have been no violation of the judge's order?

A. If Mr. Meadows had contacted the district attorney and had asked him to come there, that he wished to give a confession, he did not want an attorney present, you are correct.

Q. Yes, sir.

A. The only problem with that is the fact there was no telephone in the Tarrant County jail that he had access to at that time.

Q. Well, in other words, did Mr. Meadows tell you whether or not he instigated further conversations?

A. No, he didn't. He did not.

Q. He didn't say one way or the other?

A. No, he didn't.

. . . .

Q. When you went up there to where Johnny was on October the 4th when he was making these confessions, did he make the statement there that he wanted, you know—did he express a desire for you to leave?

A. He was not making the statement. The statement had already been given.

Q. Did he say to you he, that he wanted you to leave?

A. I don't recall. The facts and circumstances that surrounded that were as follows:

No. 1. A statement was prepared, typed up, and ready to be witnessed—

Q. Yes, sir.

A. —when I got there. The district attorney asked me if I wanted to witness it, and I said no. So I left.

Q. I see. Did you talk to Johnny at all?

A. Yes.

Q. Okay. You did talk to him.

Do you remember whether he asked you to leave or express a desire for you not to be there at that time?

MR. BONESIO: Let me object, unless he's going to predicate it on conversations in the presence of others, outside the attorney/client privilege.

THE COURT: I sustain that objection, not on privileged matters.

BY MR. BECKER:

Q. With that predicate, did he say in anyone else's presence to your recollection, did he express a desire that you not be there?

A. I don't recall that.

Q. Did you get upset with Johnny himself for signing the confessions?

A. I did not get upset with Johnny. I admonished him of the consequences of the signing of such a statement.

Q. All right, sir. Now, one thing I didn't understand from you. I know you testified in the guilty plea that you thought that he knew the consequences of his plea itself.

A. I think the admonishment that is in the record is very thorough.

Q. Yes.

A. I think my admonishment of the defendant is very thorough.

Q. Yes, sir. And you felt like he understand all of those admonishments?

A. I think he certainly was well admonished in answering each question appropriately.

Q. Knowing from what you know, do you have an opinion as to whether he understood the consequences of signing those confessions?

A. Based upon the consequences being that the confession would be used against him in a court of law, and that that would certainly not be used for him, and that if this confession was admitted in a court of law it would be evidentiary enough to convict him, yes, I think he understood that.

. . . .

Q. Did you observe or notice any difference in his demeanor, his actions, the way and manner he answered questions at the plea of guilty hearing than you have described at the bond hearing?

A. No, sir. In my opinion, he was competent to enter a plea at that point in time, based upon a nonprofessional opinion. I am not a psychiatrist. I had an ability to communicate with the client.

Q. Now, how long did you talk with him there when he first found out that he—about the confession, about this statement that he had—the written statement he had made?

A. Your Honor, Mr. Meadows and I talked privately concerning that, and there was a period of time, 15, 20 minutes, probably.

Q. Do you recall what time you first heard about this matter that day of October 4th?

A. I do not recall my first hearing about it. My first awareness about confessions, any plea or anything, was when I arrived at the jail.

Q. And do you know about what time it was?

A. I think it was noontime, Your Honor. It may have been after noon.

Q. It was noon or after?

A. Between the noon hour, right around there, I believe, close to 12:00 o'clock.

Q. When did you first see someone from Ector County?

A. Immediately. They were in the jail downstairs with Mr. Meadows.

Q. On the first floor?

A. Well, it is the ground floor, the sheriff's office.

Q. Ground Floor?

A. Yes, sir. They were with him.

Q. And do you recall specifically who you saw?

A. I believed it to be the district attorney.

Q. Do you know the district attorney, John Green?

A. I had met him, and I believe it was him. My recollection is there were three individuals there, Your Honor. I believe one to have been the sheriff. I may be mistaken. I believe there was a Barker, Barksdale, an investigator, and I am positive the DA was there, too. I am reasonably certain there were those three individuals there.

(T. 849–853, 856–857, 876–877, 906–908, 912–913).

Initiation of the telephone call of October 3, 1972, between the Petitioner and Sheriff Gabrel is disputed with each assigning origination to the other. (T. 214, 986–987, 1072).

Petitioner was in the Tarrant County jail three hundred miles from the Ector County officials with an able and experienced defense attorney. He knew he did not have to talk to anyone including law enforcement officials.

Without question there are some unusual aspects to this case. Perhaps the most significant variance from the norm is the Petitioner in his exercise of his right to act as his own counsel. Attorney Loftin lost control of his client on the day of the confession (T. 921). As noted above, Odessa Attorney Tom Sneed in his October 6, 1972 motion to withdraw cited as his "... reason that Defendant totally and completely refuses to cooperate with said attorney."

A review of all four volumes of the transcript reaffirms the observation at page 36 of the July 1, 1983 Memorandum Opinion:

Anyone who has read this or other Johnny Meadows' files will readily perceive that Mr. Meadows takes a very active part in his own cases. In fact, he sought permission to file his own pro se post hearing brief in this case despite having two able lawyers who were filing a brief on his behalf. During the evidentiary hearing he specified questions and lines of questioning which his able attorneys pursued, although frequently they had little or no relevance to the issues before the court.

At page 1130 of the transcript the Court noted:

He doesn't have enough money to employ representation of the time he has received before this court in this hearing. However, I have observed from the very first day until the last few minutes of this hearing that the petitioner himself has consistently written out questions and notes and handed them to the two attorneys and has consistently advised with them and has prepared questions that have been asked by the attorneys.

And I just want the record to show that the petitioner has been very actively involved in the questions that have been asked and the matters that have been covered throughout this now into the fourth day hearing.

Petitioner had a right to representation by an attorney but on October 4, 1972, he exercised his right to proceed pro se. It was his prerogative to sign a confession or not, and to plead guilty or not, as he chose. The Petitioner was ultimately responsible for choosing his own fate including his position before the law. The Petitioner had the moral and legal right to stand alone at the time of his confession and now must embrace the consequences of his course of action.

The events in question occurred more than twelve years ago. Petitioner and his able counsel were given an opportunity to present every witness they desired to call in the four-day evidentiary hearing.

The December 1982 evidentiary hearing showed the witnesses were employed as follows:

| Witness | Position 1972 | 1982 |
|---|---|---|
| 1. Lon Evans | Tarrant County Sheriff | same |
| 2. Petitioner | | |
| 3. Tim Curry | Tarrant County D.A. | same |
| 4. John Green | Ector County D.A. | private practice |
| 5. Deloris Ann Homsley | Petitioner's wife | Petitioner's ex-wife |
| 6. Wesley H. Green | Bible salesman | Amway |
| 7. Felda Green | housewife | Amway |
| 8. Sandy Renee Mapp | Petitioner's daughter | same |
| 9. Andrew Zoltan Fenves | Stanford undergraduate | medical expert |
| 10. Jerry Loftin | attorney | same |
| 11. Rufus Adcock | Tarrant County Asst. D.A. | district judge |
| 12. A. M. Gabrel | Ector County Sheriff | surplus store owner |
| 13. Elton A. Faught | Ector County Deputy Sheriff | heavy equipment salesman |

The names of three other persons came up several times during the evidentiary hearing:

| | | |
|---|---|---|
| 14. Tom Sneed | attorney | deceased |
| 15. Tom Barker | Ector County D.A.'s investigator | Odessa bail bondsman |
| 16. Charles W. Lindsey | district judge | retired |

No suggestion of misconduct is made by Petitioner against the four Tarrant County officials. Sheriff Lon Evans retired at the end of 1984 having elected not to seek another term. Judge Charles W. Lindsey retired from the bench several years ago. Rufus Adcock has resumed his position as an assistant district attorney for District Attorney Tim Curry of Tarrant County.

None of the Ector County officials against whom most of Petitioner's allegations are made: John Green, A.M. Gabrel, Elton A. Faught, and Tom Barker, were involved in law enforcement in any capacity at the time of the 1982 hearing.

Some of the procedures employed by the Ector County officials would not serve as the optium standard. Clearly, having contact with a defendant behind the back of his attorney is suspect. However, prior to the signing of the Green statement, and probably before the signing of any statement, Attorney Loftin counseled with Petitioner in private not to sign the confession but Petitioner exercised his constitutional right to disregard his attorney's advice and to sign the statement. Mr. Loftin advised Petitioner to go to trial but again he was his own counsel.

Petitioner in his Memorandum of Law at page 20 urges *Fountaine v. United States*, 411 U.S. 213, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973) as

... a case that is factually similar to the case at bar.... with which evaluation the court is not in complete agreement because Fountaine acted without counsel, waived indictment, and confessed three days after arrest. The Sixth Circuit opinion in *Fontaine v. United States*, 526 F.2d 514, 515 (6th Cir.1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1476, 47 L.Ed.2d 743 (1976), discloses one of the state officers

... established a close relationship with petitioner during this time, helping petitioner out of jail once to talk to his family, and bringing toys to his children at Christmas time....

■ Scrutinizing the circumstances surrounding the October 4, 1972 confession and the circumstances thereof for any abiding impact or taint of his guilty plea, the court finds from the credible evidence presented:

1. Judge Charles W. Lindsey entered an order barring contact by Ector County officials with Petitioner without counsel being

present, unless Meadows waived his right to counsel (T. 374);

2. Petitioner Meadows contacted Sheriff Gabrel by telephone on October 3, 1972, asking him to come to Fort Worth;

3. Petitioner knew he did not have to see any officers;

4. Messers Green, Gabrel, Faught and Barker visited Petitioner at his request upon his waiver of counsel on October 4, 1972, in the Tarrant County jail;

5. Attorney Loftin discovered Meadows was striking a deal on his own, and counseled in private with Meadows advising he not sign any statement and go to trial;

6. Meadows acting pro se against the advice of his counsel voluntarily and knowingly signed the Green statement;

7. No coercion was used to obtain the Green statement;

8. Meadows entered his plea of guilty voluntarily and with a rational understanding of the consequences of such action;

9. Meadows' confession was not coerced and accordingly, had no abiding impact on, nor tainted his guilty plea.

This opinion will serve as the court's findings of fact and conclusion of law. Rule 52(a), Federal Rules of Civil Procedure. A judgment will be entered denying Meadows' petition for writ of habeas corpus on the issues:

1. Whether Meadows' October 4, 1972 confession was coerced—because the Green confession was not coerced; and,

2. Whether the circumstances of that alleged coercion had abiding impact and tainted his guilty plea—because the Petitioner exercised his constitutional right to: (i) contact the Ector County officials; (ii) waive the presence of his attorney; (iii) act as his own counsel; (iv) sign a confession; and (v) plead guilty. Having exercised his moral and legal right to stand alone at the time of his confession and to plead guilty against the advice of counsel, he must embrace the consequences of his course of action.

ORDER

Petitioner Johnny J.E. Meadows in his direct testimony at page 172 of the transcript interjects the sub rosa hearing—the state hearing before Judge John Vance where the state failed to discharge its burden of establishing the voluntariness of the Cugot and Maynard confessions; this hearing for unexplained reasons is called the sub rosa hearing.

The former state prosecutor testified

.... when the petitioner testified before Judge Vance about these brandings, that this completely enraged the judge there, which I can greatly understand, and he said he was dismissing these statements ... he granted the motion to suppress, he granted the motion to suppress, whether those had anything to do with it or not.

(T. 564–565).

Immediately thereafter this Court in remarks addressed to Petitioner and his counsel said:

THE COURT: You all brought all of this out, and I have been trying to clarify it. I became incensed sitting here to think that law official people were accused of branding an inmate. And I had already made up my mind, if anything came before this court that that had occurred by officers, I don't care where they are, I'm going to take steps to see that those officers are brought to justice and prosecuted, if there's any way that it can be done. That's how strong I feel about it.

And that's the reason that—and, of course, what this witness says gives a different light on the thing, but I think I understand now the situation.

Respondent offered to introduce the attorney general's investigation concerning the branding incident. (T. 1122).

Petitioner (T. 1129–1130) and his counsel (T. 1125–1128) advised they did not want to get into the matter of the branding—"I don't want it in there...." (T. 1129).

The Court noted the branding incident had bearing on the credibility of the witness (T. 1126). The Court at the conclusion of the evidentiary hearing held the attorney general's report would not be admitted and the branding incident would not be considered (T. 1132).

Footnotes 2 and 3 of the said October 17, 1984 per curiam opinion and Judge Vance's remarks indicate the alleged branding incident is having the same effect in this habeas action as the tossing of a dead skunk into a jury box accomplishes even after the carcass is removed, to-wit: the pungent offensive odor remains.

■ The writ of habeas corpus may issue only when the prisoner is in custody in violation of the Constitution or laws or treaties of the United States. See *Broussard v. Lippman,* 643 F.2d 1131 (5th Cir. 1981). Habeas corpus actions are important to all parties and are more than games.

The Court in the evidentiary hearing and the opinions stemming therefrom has sought to determine the true facts so substantial justice will be achieved.

Judge Vance at page 147 of volume two of the Sub Rosa Hearing advised he was going to request a full investigation by the Federal Bureau of Investigation and the Attorney General of Texas. Since the Attorney General is counsel for the Respondent, the Court on its own motion determined the record in this habeas action should be supplemented by the filing of the report of the Federal Bureau of Investigation, if in fact Judge Vance had carried through on his pronouncement from the bench.

Three reports of the Federal Bureau of Investigation were made: (1) May 17, 1973 —42 pages; (2) May 25, 1973—4 pages; and (3) June 6, 1973—2 pages. The Court finds the ends of justice will be served by supplementing the record in this action by the filing of the Federal Bureau of Investigation report prepared at the request of Judge Vance; accordingly,

IT IS ORDERED:

1. the reports of the Federal Bureau of Investigation concerning the branding of Petitioner be filed in this cause;

2. the said Federal Bureau of Investigation report be sealed and not be opened without order of the Court.

3. the parties and their respective counsel upon application to the Court will be permitted to inspect said reports.

4. these sealed Federal Bureau of Investigation reports shall be maintained by the Clerk of the Court during the life of Petitioner and shall not be destroyed without express written order of the Court.